at all. And we'll turn to the last case on our calendar, 20-1908, Neborsky, N-E-B-O-R-S-K-Y v. Town of Victory et al. Ms. Buckman? Thank you, Your Honor. May it please the Court, my name is Deborah Buckman, and I represent Ruth Neborsky. This appeal involves two major issues. One is an equal protection claim involving voting rights, and the second is a defamation claim. Underlying both of these issues is the fact that the summary judgment standard was not followed by the District Court. The District Court, rather than viewing the evidence in light most favorable to Ms. Neborsky, weighed the conflicting evidence and found in favor of the defendants. First, in regard to equal protection voting rights, the District Court compared Ms. Neborsky to those who were sent challenge letters and did not respond. But there's a smaller group within that group. Ms. Pogany and Ms. Neborsky, who were both sent challenge letters and did not respond, were both removed from the checklist, but both asked Ms. Easter to be reinstated. And Ms. Pogany was reinstated, Ms. Neborsky was not. A second group that we believe Ms. Neborsky should be compared to is the group that were sent challenge letters. And Ms. Neborsky was different than any of those persons. She was the only member of that group. When viewed in light most favorable to her, there was actually a longtime resident who had never moved. And finally, there's another group, and that, if you compare Ms. Neborsky to all the voters on the checklist, which we believe is the proper comparators, 11 others on that checklist had no evidence at all. And at least one of those 11 had not even been seen in victory for years. The second issue is the defamation claim. The key issue in that claim is whether there was sufficient evidence of malice to go forward against a public official like Ms. Neborsky. This standard requires proof of a mental state, that of knowledge of the falsity of the statement, and that is almost always proven by circumstantial evidence. I'd like to focus on two of the false statements made by Ms. Batchelor and Ms. Loomis and Ms. Easter. The first was the issue of missing records. All three individual defendants repeatedly claimed they were missing records. Ms. Easter and Ms. Loomis even claimed that Ms. Neborsky and her husband burned records. The evidence shows that they knew there were no missing records. Ms. Batchelor had in her possession copies of the town records for over 18 months, and was tasked and paid for analyzing them and reviewing them. Ms. Easter and Ms. Loomis had been town clerk and chair of the select board, respectively, for two years prior to the claim the records were missing. And the originals were in the very small 72-square-foot town vault where the records were kept in neat chronological order and easily accessible. So they had to have known that their claim was false. And the claim that the records were burned was an outright lie. No records were ever burned. And the second false claim was that there were 128 discrepancies in the check made out by Ms. Neborsky amounting to over $300,000. Similarly, all parties had possession of those documents for years, and those documents were easily accessible and reviewable. And that is evidence that they knew those statements were false. And I believe my three minutes is up, and I would like to hear your questions. Judge Pooler. Thank you. Does possession of the records, as you allege, satisfy the need for malice against, in this case, actual malice? Your Honor, I apologize. Your question was not clear to me. I'm sorry. I asked, you said they had possession, the people that you're suing, had possession of the records. Does possession of the records, is that enough to prove actual malice in, for the defamation against the public official? Yes, Your Honor. We believe in this particular case, the facts show that that is, that's certainly circumstantial evidence that they knew what they said were false. And the reason is that in this particular case, the record shows that the records they claim were missing, I look, in regard to Ms. Batchelor first. Ms. Batchelor picked up all those records in 2014. And she claimed, you know, she said she picked them all up. And she had them in her possession. And she was tasked as an accountant and as an auditor to review all those records. And so she had possession of those records. But there are other, in regard to Ms. Batchelor, there are other, there's other evidence that shows that she knew that what she said was to try to get the records from Ms. Batchelor. She gave, she gave us most of the records, but she did not give us the records that showed that the checks that she claimed showed discrepancies. She did not give us her work papers. And she successfully fought that in court. So she did not allow us access to the records that would prove that what she said was wrong. So that's the second. Counsel, who are you claiming defamed Ms. Dvorsky? Am I claiming who? Who do you claim defamed her? All three, all three of the defendants defamed my client. They, they all three claimed that there were missing records, that there was, and Ms. Easter and Ms. Loomis claimed that my client stole money. They all claimed that, Ms. Batchelor claimed that there were $300,000 worth of discrepancies in the record, which, and there were none. There were no discrepancies. And she was tasked with analyzing those records. So all three of the defendants, individual defendants in this case, we are claiming defamed my client. Well, you know, it's not so easy to claim defamation for a public official as Ms. Dvorsky was at the time, right? You have to prove actual malice, as I have. And you prove that how? By knowing that what they said was false? Is that, is that your answer? Yes. And that's, that's what the New York Times standard is, that a person knows the statement was false or acted in reckless disregard for the truth. And in this particular case, there is ample evidence that all three individual defendants knew that what they said was false because they had easy access and actually possession of the underlying documents. And going back to your original question, what you're asking is whether possession is enough. In this particular case, it is because the records were in a very small area. They were 72 square foot vault. They were, they were in order. They were easily accessible. They were in notebooks, in chronological order. Anyone could have walked into that vault and within a few minutes could have determined whether the records were missing. And therefore, we think in this particular case, that is certainly sufficient evidence of malice or certain evidence that they knew what they said was false. Thank you. I have no further questions, Judge Cabranes. Judge Bianco. Yes, thanks, Judge Cabranes. Ms. Buckman, on the issue of the class of one claim, every single person who did not return the challenge letter was removed, including your client, right? Correct. So why doesn't that eliminate the whole class of one? I know you want to define the class differently, but their position is if you don't return the challenge letter, you get removed. And they didn't just do that to your client, they did it to everybody. So doesn't that defeat the whole claim? Well, there's two issues to that. First of all, we believe that the group should be either the people who were sent challenge letters, and those people, Ms. Zaborski was the only one who was an actual resident of town. She had paid tuition at a school in another town, right? That was the basis for the challenge letter, right? Well, no, she did not pay tuition from another town. The way town tuitioning works in Vermont is that if a town does not have a school, the town itself pays tuition directly to the school where the student attends. Ms. Zaborski, and the record shows this, Ms. Zaborski did not know that the town of Kirby had paid for her son's last semester at St. Johnsbury Academy. It doesn't matter what she knew, we're talking about what they had. They had information that I misspoke, that the town had paid the tuition for the school in another town. But I don't want to get caught up in that. If I disagree with you and think the class should be people who received the challenge letters, what's your response to that? Well, the response is that Ms. Pogany was also in that group that received the challenge letter. She got removed. And she asked to be reinstated, Your Honor. And she was reinstated by Ms. Easter. And Ms. Zaborski actually walked into the town clerk's office, showed her license to Ms. Zaborski and stayed her. Well, no, no, that's not what happened. The evidence was that the town clerk said she had to talk with the BCA. And before she could get that okay, your client appealed, right? Well... Short-circuiting the ability to be... Ms. Easter did not send Ms. Pogany's application to the Board of Civil Authority either. The board's decision came down and said that that was the procedure that had to be followed. So they knew that that was the procedure that had to be followed. And they were following it. No, no, Your Honor. Ms. Easter did not follow the procedure equally between Ms. Pogany and Ms. Zaborski. All right. Let me just ask you one more question on the defamation part of the case. They cite the fact that your expert admitted that there was $117,000 expenditure for which there was no board authorization, that the board authorization was missing, and that Mr. Iacoboni conceded that and obviously said that's significant because you would need board authorization. So why isn't that an example of a missing record with respect to a significant amount of money? That $117,000 check was voted on by the town. Where was the paperwork? I'm sorry? Where was the paperwork? You're saying it was voted on, but your expert said that he also concluded it was missing. The board authorization was missing. That's because the board did not need to authorize it because the town meeting authorized it. All right. But even if that's true. So there was a record that it was authorized. Even if that's true, that goes back to Judge Poole's point. And the fact that there was no board authorization paperwork would seem to me to be pretty significant in trying to be able to prove that there was actual malice. But in any event, I have no further questions. Your Honor, if I may follow up on the issue of the tuition from Kirby. Excuse me, you have one minute left. The tuition from Kirby was paid because the chair of the Board of Civil Authority called the superintendent and told them that Ms. Zaborski was a resident of Kirby, which was false. And the chair of the Board of Civil Authority voted, along with the other members of the Board of Civil Authority, to remove Ms. Zaborski from the checklist based on her own false statement. Is she a defendant? No, but the town of Victory is, Your Honor. And that was the town of Victory. The Board of Civil Authority was an entity of the town of Victory. All right. You've reserved one minute after we've heard from counsel for the other parties. Mary Kate Kelly for the town of Victory. Thank you, Your Honor. May it please the court. My name is Mary Kate Kelly, and I represent the town of Victory. I'd like to address Ms. Zaborski's sweeping claim that her comparators for her class one claim are every voter on the town checklist. As the briefing in this matter makes clear, the BCA treated everyone the same. Everyone who did not respond to a challenge letter affirming their residency was removed from the checklist. Nor can Ms. Zaborski identify a similarly situated person with regard to the town clerk's decision, in accordance with statute, to refer her request to be turned to the voter checklist to the Board of Civil Authority. The BCA had just removed her from the checklist, and that's the entity who has final authority over the checklist. Ms. Poggini, her closest comparator, was not similarly situated. They were both removed from the voter checklist when they didn't return their response to a challenge letter. Subsequently, after Ms. Zaborski applied to be put back on the checklist, and the town clerk indicated it needed to go to the Board of Civil Authority, the Superior Court issued a decision instructing the town to add Ms. Zaborski back to the voter checklist. The town clerk's decision to add Ms. Poggini to the voter checklist without checking with the Board of Civil Authority was rationally based and resulted in Ms. Poggini being treated similar to Ms. Zaborski. Rather than presenting any evidence to support a Class 1 claim, what Ms. Zaborski is seeking is to have this court review and compare the indicia of residency to persons on the checklist. Ms. Zaborski cites no case law to support this argument. There is no support in law or fact. Ms. Zaborski urged in implying that the town performed an investigation into the residency of each person applying to be on the voter checklist and treated them differently. That's not how this works. Rather, the town clerk relied on the sworn statements of the applicants. Or, if the town clerk or the BCA questioned a person's residency, the BCA relied upon the sworn statement or affirmation of residence in response to the challenge. Ms. Zaborski alleges that because the Superior Court found that she was a resident for voting purposes, the town fabricated reasons to remove her from the voter checklist. However, the undisputed facts in her own testimony regarding residency made clear, as the Superior Court found, that there was reason to doubt her residency, and the shifting of facts and analysis may have admitted to more than one conclusion. Moreover, the BCA didn't remove her from the voter checklist because members raised issues about her residency. Rather, they sent her a challenge letter based on those residency. She was removed from the voter checklist because she failed to respond to the challenge letter. I see my two minutes is up. I'll take any questions at this time if there are any. Hearing no questions, I'll just conclude. After a denial of a right to vote or a valid equal protection claim, this court should reframe from delving into minutia of residency determinations and leave that to the state courts. Ms. Zaborski brought this as a claim of one claim. Her claim fails for lack of similarly situated comparators, and there was a rational basis for any differential treatment. The time rests on its brief. Thank you, Ms. Kelly. Thank you, Your Honor. Fine. Judge Bianco or Judge Pruitt, any questions for Ms. Kelly? No thanks. Okay. No thanks. All right. Mr. Kevin. Thank you. For Easter et al. Thank you, Your Honor. May it please the court. I am Kevin Kite from Carol Bow Pellen Kite in Middlebury, Vermont, and I am representing Fern Loomis and Carol Easter individually in their individual capacities. And as Mary Kelly explained, the Equal Protection Clause claim must fail because Ms. Zaborski has not provided a class of one comparator, and we'll just defer to the arguments already made on that point. With respect to the defamation claim, Ms. Zaborski's biggest problem in this case and has been throughout the litigation is that she continues to equate eventual proof of falsity with knowledge on the part of the defendants as to the falsity of those claims. Throughout, she has argued that just because something has been shown not to be true, i.e., that Ms. Zaborski was in fact a resident of Victory, just because that subsequently proved to be true, that somehow or another that's evidence of the fact that the individual defendants knew that to be false. And the case law is pretty clear that that's simply not enough. The strongest case on this point is probably St. Armand in which the facts are pretty out there in terms of the alleged defamer being very reckless with regard to the information they're providing about the public figure, and the Supreme Court in that case indicated that that was not going to be sufficient. The evidence that's presented here on the record doesn't come anywhere close to the kind of evidence that was there. And here today, an oral argument, Ms. Zaborski points specifically to the missing record as now the fact that it's somehow indicative of actual malice. But as the court's questions have already started to probe, those missing records arguments, on the one hand, refer primarily to the Batchelder defendants, in that Ms. Easter and Ms. Loomis were responding to preliminary reports from the Batchelder associates in their audit and had referred their concerns to Batchelder associates, and therefore didn't have access necessarily to the records that she's referring to. And the argument about the records being accessible in the vault is similarly not sufficient to show that they knew in fact that it was false. And I see that I'm approaching my three-minute mark, so I want to give the court an opportunity to ask questions if it wishes. Thank you. Judge Pooler? Thank you. I have a question about Ms. Loomis' Facebook post on October 16, 2016, which Judge Crawford includes in his decision. She says, people move in from out-of-state or other side of Vermont and try to control us laid-back dummies and steal over $300,000 from us, then goes to bed with the authorities and gets off! Isn't that defamatory? The question in this case has never been about whether or not the alleged statements would be defamatory in nature. The question is whether or not the defendant spoke the statements with knowledge of the falsity of them at the time that they spoke them. And did she know at that point that $300,000 was not stolen? This is steal over $300,000. Didn't she know this? I'm not sure where that falls in the timeline, Your Honor, but it's my recollection that the audit had not been completed, the charges had not finally been settled, and it was still sort of dealing with fallout of the investigation. Which, by the way, cleared Ms. Naborski of everything, did it not? Yes, it did. September 2016, Ms. Loomis says, I know there is missing evidence. Isn't that a false statement? That is a statement of opinion about what she believes to be true. But wasn't it false? I don't think that it's evidence that she knew it was false at the time she said it. I'm not sure the question was the outcome. I just want to clarify one thing. On this issue of the $300,000, it was based upon the batch of the defendants that indicated that there were discrepancies, I think, in 128, I guess, checks totaling over $300,000. I'm just trying to understand what the basis was for that particular claim, the $300,000 claim. Yes, Your Honor, that figure that's been thrown out and was thrown out by the parties many times was based in part on the audit performed by the Batchelder Associates and the initial understanding of what the amounts at issue might be. And at the time she made those statements, what was the status of that? It was still ongoing? I believe it's still ongoing, Your Honor. All right. All right. Thank you. All right. We'll hear from Mr. Franklin. Yes. Hi. Good afternoon. May it please the court. This is Gary Franklin from Primer Piper. I represent the Batchelder defendants. I think the current posture of the case is at least somewhat informed by the claims that have been dropped. Plaintiff had initially claimed a liberty interest, which would have required her to show that Batchelder was a state actor acting in concert with the town officials. And that claim is no longer before the court, no longer in dispute. As well, she dropped her conspiracy claim, which again would require the showing of joint action. And again, that is no longer in dispute. And thus, it is really no dispute that plaintiff or that Batchelder was acting independently in her professional capacity as an auditor and shouldn't be lumped in with any of the other defendants or the town. There's nothing in the record that indicates that Batchelder had reason to believe that the statements that she made in her professional capacity as contained in her audit were, in fact, untrue at the time that she made them. It's important to remember that the audit reports were about whether proper controls were in place. Batchelder's findings of a lack of financial controls is being blown way out of proportion by others, including by Plaintiff herself, who's been locked in a feud for many years involving many lawsuits. Plaintiff's own expert, as picked up by Judge Bianco, concedes that town money was being spent without proper both board authorizations, which is an essential component of the audit. And the quotes from Plaintiff's expert are extensively quoted in my brief. Plaintiff never addresses these concessions, or not before Judge Bianco asked her about them, and fails to explain how a further investigation would have changed the outcome of the audit reports, particularly given that no board authorizations were ever produced to support the expenditures in question, which is the lack of control that Batchelder points to. It's also noteworthy, as the district court pointed out, that the inspector for the Vermont State Police concluded that while they found no evidence of criminal behavior, they did agree that there were facts that clearly supported questionable accounting practices. And that's at the joint appendix, page 656. Given these findings by Plaintiff's own expert and by the Vermont State Police, it's hard to imagine how Batchelder can be found guilty of actual malice when in fact there are parts of the record that support her findings. Most of Batchelder's findings, in fact, are not even disputed. They're just not even raised. Given the fact that the record supports Batchelder's findings, Plaintiff cannot carry the burden of creating a tribal issue fact with respect to actual malice when we believe that the district court's decision should be affirmed. Thank you. Judge Pooler, any questions? I have no questions of this attorney. Thank you. Judge Bianco? No, thank you, Judge Codoni. All right, so we now have Ms. Buckman who's reserved some time. Thank you, Your Honor. I'd like to make just a couple of points. One is in regard to the voting issue and the equal protection issue. The basis for the Board of Civil Authorities' decision was based on falsehoods made by Ms. Loomis and Ms. Easter, and also on falsehoods based on the chair of the Board of Civil Authority, Ms. Peters. Now, Ms. Loomis and Ms. Easter were also members of that board, and they were part of the decision to send the challenge letter. Both Ms. Easter and Ms. Loomis stated that my client had moved out of her house in 2010, and Ms. Easter wrote a letter to the editor saying that. That's a lie. That was not true. And again, Ms. Peters had called the superintendent and also said that my client had moved out of her home, which was also false. You're not claiming that that is defamation, are you? That particular claim? When they said she moved out of her house? No, Your Honor. What I'm saying is that the Willenbrook case talks about equal protection class of one. You have to show that someone was intentionally treated differently, and there was no rational basis for the treatment. And what we're saying is my client was treated differently based on lies by the people who made the decision. And so we say that's an intentional treatment, a differential treatment, and there was no rational basis for sending that challenge letter. And just very briefly, Your Honor, in regard to the financial records, Mr. Franklin stated that there were no board authorizations for the discrepancies. And the Joint Appendix, pages 733 to 745, which is Mr. Buckman's affidavit, show that, in fact, there were authorizations for all those checks. Ms. Buckman, this is Judge Cabranes. I have an uncomplicated question. Judge Crawford's decision, which is rather long and carefully drafted, raises all kinds of large questions, portentous questions of law. But I'm curious, given the fact that this is a town of approximately 62 inhabitants, are you personally familiar with the town of Victory? I am, Your Honor. Now, I'm just curious, the question of fact, when we have this business about Ms. Muborski having been thought to have moved, when in fact she has not moved, what does this town, would you describe what this town looks like and how these 62 inhabitants interact with each other physically? That is, is there a main street and is there... Your Honor, it's a beautiful place. It has a... I have no doubt of it. It's quite remote, in a remote part of Vermont. How remote are the inhabitants, the 62 inhabitants? Well, actually, Ms. Easter actually lives next door to Ms. Muborski, and that's in the record, Your Honor. Ms. Loomis lives on a different... There's two main towns, excuse me, main roads, and Ms. Loomis lives on the other main road, but she's friends with Ms. Easter and... Oh, I'm sorry, I'm making a mistake. She is on that same road, but it's not a next door neighbor. She, as I remember, has to go by Ms. Muborski's house to get to her house. What does next door mean? Next door can mean something quite remarkable in Texas. Well, next door, in this case, Ms. Easter can see, I believe, I believe can see her house. It's not like it's, you know, half a mile away or anything. And then, and I do correct myself, Ms. Loomis lives up above Ms. Easter, and so has to drive by Ms. Muborski's house. I see, all right. Your Honor, you should visit Victory. It's a wonderful place to visit. I'm sure it is. I'm sure it is. Someday when this case is over, if it's ever over... There you go. I will try to do that. I wouldn't want to be making, having any ex parte context. Right, right, Your Honor. All right, thank you very much. Thank you. We'll reserve the decision in 20-1908, and I'll ask the clerk to close court. We are adjourned. Court is adjourned.